NOT DESIGNATED FOR PUBLICATION

No. 122,252

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CARRODY M. BUCHHORN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed August 13, 2021. Reversed and remanded.

*William J. Skepnek*, of The Skepnek Law Firm, P.A., of Lawrence, *Keynen J. (K.J.) Wall*, *Quentin M. Templeton*, and *Russell J. Keller*, of Forbes Law Group, LLC, of Overland Park, *Stephan L. Skepnek*, of The Sader Law Firm, of Kansas City, Missouri, and *Kevin Babbit*, of Fagan & Emert, LLC, of Lawrence, for appellant.

*Emma C. Halling*, assistant district attorney, *Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., HILL and CLINE, JJ.

PER CURIAM: This matter involves a child who died unexpectedly at the home daycare where Carrody M. Buchhorn worked. Buchhorn was the last person who admitted having contact with the child. After the Douglas County coroner ruled the child's death was instantaneous and caused by a blow to the head, a jury convicted Buchhorn of second-degree murder. We reverse Buchhorn's conviction and remand for a

new trial because her trial counsel's constitutionally deficient performance prejudiced her right to a fair trial.

## FACTS

Nine-month-old O.O. was found unresponsive in a Eudora daycare crib, following an afternoon nap. The owner called 911, while Buchhorn performed CPR on O.O. Despite Buchhorn's and first responders' efforts to resuscitate the baby, O.O. did not survive.

During the investigation of O.O.'s death, police interviewed Buchhorn twice. She waived privilege in both interviews and consistently denied harming O.O. Buchhorn, a mother of two grown children, had no history of abuse or violence and no prior criminal history.

The Douglas County coroner, Dr. Erik Mitchell, performed the autopsy on O.O. Dr. Mitchell's autopsy revealed that O.O. had suffered a significant skull fracture but no brain swelling. Dr. Mitchell deduced that O.O. died instantly following a blow to the head, which he claimed released mechanical energy into the base of the brain causing "temporary cessation of function at the base of the brain" or "depolarization of neurons." He suspected that O.O. was stepped on.

Since Buchhorn was the last person who admitted having contact with O.O., the State charged her with first-degree murder and in the alternative, second-degree murder, a felonious, unintentional, but reckless killing of a human being. Buchhorn retained law partners Paul Morrison and Veronica Dersch to represent her.

Dr. Mitchell testified about his "depolarization theory" on O.O.'s cause of death at the preliminary hearing. He said he believed, "going on statistics," that O.O. died

2

instantaneously due to "a direct effect on depolarization of neurons at the area of the base of the brain, upper spinal cord manila, [which] interferes with the ability to breathe, and that leads to death." He concluded O.O. had no "anatomic deformity or no anatomic reason to be dead other than the physical injury, and that this physical injury will release energy into the area that is critical for survival at the base of the brain."

Buchhorn's trial counsel did not elicit information about the foundation of Dr. Mitchell's depolarization theory or challenge it at the preliminary hearing. Her counsel did not ask Dr. Mitchell about the statistics on which he relied to develop his theory, nor did they ask Dr. Mitchell to identify any medical literature which may support or address this theory.

At trial, Dr. Mitchell recounted his opinion on O.O.'s cause of death. He again noted that O.O. had a skull fracture with little brain swelling, which caused him to conclude not much time had passed between the trauma and death. Dr. Mitchell said a skull fracture is not inherently fatal but becomes fatal if energy is transferred to the brain. He also testified that if someone were with O.O. when the injury occurred, that person would immediately recognize something was wrong with O.O. and that O.O. needed immediate care. Buchhorn's trial counsel raised no objections to Dr. Mitchell's testimony regarding his depolarization theory.

In addition to Dr. Mitchell's testimony, the State also admitted electronic messages from Buchhorn sent shortly before O.O.'s death, complaining about her low pay and disparaging the attitude of the daycare owner.

Buchhorn's trial counsel retained a forensic pathologist, Dr. Carl Wigren, to testify at trial. Dr. Wigren resided in Seattle, Washington, and was referred to them by another expert who was not taking any new cases. Dr. Wigren did not address Dr. Mitchell's depolarization theory in his testimony. Instead, he alternatively interpreted O.O.'s

3

injuries. Dr. Wigren testified that he believed O.O.'s skull fracture showed signs of healing from an injury that was a few days to a week old. When asked if he knew what killed O.O., Dr. Wigren said, "I honestly don't."

The State relied heavily on Dr. Mitchell's opinion on O.O.'s cause of death in closing arguments. Because Dr. Mitchell contended that death by depolarization is nearly instant, the State repeatedly argued this theory implicated Buchhorn, as the last person to care for the child. The State also argued Dr. Mitchell was more credible than Dr. Wigren, noting his opinions were more reliable because of his "impressive" professional experience. Buchhorn's counsel argued the State presented only circumstantial evidence.

The jury deliberated for two days before returning a verdict of guilty on the lesser charge of second-degree, reckless murder.

After the verdict, Buchhorn hired new counsel and moved for a new trial. Among other issues, Buchhorn challenged the admissibility of Dr. Mitchell's depolarization theory under the *Daubert* standard for expert opinion testimony and raised several ineffective assistance of counsel claims, including (1) trial counsel failed to investigate Dr. Mitchell's testimony, (2) trial counsel failed to file an appropriate *Daubert* motion, and (3) trial counsel failed to present responsive expert testimony at trial. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

Several witnesses testified at the subsequent evidentiary hearing. Dr. Mitchell also produced materials for this hearing, after the jury trial, that he contended supported his theory of depolarization.

*Failure to challenge depolarization theory*

Dr. Sudha Kessler, a licensed physician and board-certified pediatric neurologist, testified for Buchhorn. She practiced pediatric neurology at the University of Pennsylvania Children's Hospital in Philadelphia, and she had extensive experience treating pediatric brain injuries and assessing the effect of head trauma. Dr. Kessler testified she investigated causes of death as a quality review panel member.

Dr. Kessler evaluated Dr. Mitchell's depolarization theory and found it to be unreliable. She testified that some energy, such as electrical or electromagnetic, can impact the signals of the brain cells, but not kinetic or mechanical energy, such as a force from a blow to the head. Dr. Kessler was "not aware of any circumstances in which mechanical energy directly translates into electrical change in the brain." Dr. Kessler had never heard or read about a brain death with no evidence of brain injury.

Dr. Kessler reviewed texts, published studies, and other sources of medical research, but she found no support for the proposition that mechanical energy can depolarize, interfere with, or disrupt the brain cells or nerves and cause instant death, without causing injury to the brain. Dr. Kessler also reviewed the literature Dr. Mitchell produced posttrial and testified she did not believe it supported Dr. Mitchell's theory. Dr. Kessler further noted:

> "[Dr. Mitchell's theory is] just fantastical, because it's not something I have ever been taught, not something I teach, not something—just not consistent. It's not consistent with the medical literature because there is no literature on magical disruption of the brain that causes death and that doesn't exist. In addition to looking though my own textbooks, looking through the two database searches I did, I was so taken aback by all this that I . . . [asked] my colleagues if they have heard of this idea; and honestly, most of the time, the response that I got was laughter."

5

Dr. Yu-Tze Ng, the Chief of Neurology at Children's Hospital in San Antonio and a tenured pediatrics professor at Baylor College of Medicine in Houston, also testified for Buchhorn. Dr. Ng testified he does not like using the term "depolarization" because that is something that happens normally. Dr. Ng also said he believed Dr. Mitchell was trying to imply a sudden cessation of the whole brain. Dr. Ng stated:

"[W]hether it's from depolarization, which is some function, [a sudden cessation of the whole brain], is just not possible without any evidence that there was some brain injury that would persist short of completely beheading the patient or cutting, disconnecting the upper brain stem, the medulla and all those brain parts to the spinal cord. I just can't fathom how a patient would have died with no evidence whatsoever [of brain injury]."

Dr. Ng testified that Dr. Mitchell's theory diverged from medical science. Dr. Ng said the articles Dr. Mitchell provided to support his theory actually contradicted Dr. Mitchell's claims. Dr. Ng stated that he did not know how O.O. died but, based on the evidence, O.O. did not die from a brain injury.

Dr. Wigren also testified at the posttrial hearing. He stated he did not know Dr. Mitchell would present his theory of depolarization or that the theory would be such a pivotal part of the argument in this case. Dr. Wigren said that in all his communications with Buchhorn's trial counsel, including during the trial, they never asked him to address Dr. Mitchell's opinion.

Dr. Wigren testified that if trial counsel had asked about the viability of Dr. Mitchell's theory, he would have written a supplemental report and recommended trial counsel consult with a neurologist. He also stated he had never heard this theory expressed and had been unable to find any authoritative medical literature to support it.

Dr. Mitchell testified for the State at the posttrial hearing. He admitted O.O.'s case was the exception, rather than the rule, because most head trauma cases included

6

observable injury. When asked about the statistics on which he relied to support his theory, Dr. Mitchell testified he was thinking of the transfer of energy to the brain which occurs in all brain injuries. He admitted he would probably change how he used the word statistics in his testimony. He also testified that his use of the word statistics was him trying to convey a likelihood, not to suggest he had actual statistical information, and that "it was a poor choice of words in retrospect."

Dr. Mitchell testified he had observed two cases in which immediate death occurred after a concussive injury to the brain stem, and, in both cases, neither victim had any sign of significant brain injury. He testified one of those cases occurred in 1980, during his residency in North Carolina, and the other occurred in the early 1980s or 1990s in New York. He had no records on these cases and had made no effort to find them. Dr. Mitchell testified that he had done about 12,000 autopsies during his nearly 40-year career. He admitted on cross-examination that 2 cases out of 12,000 is "a very small number."

When asked about the posttrial materials he supplied and relied on to support his theory of depolarization, Dr. Mitchell admitted his materials did not provide any studies of people who died after suffering blunt force trauma in which there was no evidence of injury to the brain. He acknowledged that much of the literature he had provided dealt with general neurological principles and not the exact issue of instantaneous death from concussive force.

Alice Craig, a professor at the University of Kansas School of Law and attorney at the Paul E. Wilson Project for Innocence & Post-Conviction Remedies, also testified for Buchhorn at the posttrial hearing. She testified that for trial counsel to fully understand and challenge evidence, he or she must independently research the issues and consult with experts if necessary. Craig also stated that given the complicated nature of cases involving a brain injury, counsel would at least need to hire a forensic pathologist and

7

may also need to hire a radiologist, biomechanical engineer, neuropathologist, or neurologist.

Craig testified she believed Buchhorn's trial counsel failed to provide objectively reasonable representation. Craig contended counsel violated the professional standard of care by failing to file a pretrial *Daubert* motion to exclude Dr. Mitchell's testimony and discover the scientific and factual basis for his depolarization theory. She testified Dr. Mitchell's preliminary hearing testimony raised enough questions about the science behind O.O.'s cause of death and the basis for Dr. Mitchell's theory that counsel should have filed a *Daubert* motion to challenge the validity of his theory.

Craig also testified that Buchhorn's counsel could not effectively cross-examine Dr. Mitchell or exclude his testimony without the right experts. She said counsel did not adequately challenge the State's theory of O.O.'s cause of death. Craig acknowledged that counsel hired Dr. Wigren, a forensic pathologist, but still believed a neurologist was necessary to testify in this case. Craig additionally criticized counsel's failure to ask Dr. Wigren specifically about Dr. Mitchell's theory that the blunt force injury interrupted and depolarized O.O.'s nerves.

Both Morrison and Dersch testified at the hearing. Morrison admitted Dr. Mitchell's testimony was "very important" and agreed they needed to challenge his depolarization theory. Yet, Buchhorn's trial counsel did not independently research or investigate Dr. Mitchell's depolarization theory. Instead, they relied on Dr. Wigren to define the medical issues they needed to address.

Morrison admitted they did not consult with or talk to any experts other than Dr. Wigren. Morrison testified he was "comfortable that [Dr.] Wigren could handle it," and "we took our direction from him." On the other hand, Morrison testified both he and his

co-counsel were frustrated with how difficult it was to get ahold of Dr. Wigren and how busy he was. Neither Morrison nor Dersch had ever worked with Dr. Wigren before.

Morrison admitted he never considered filing a *Daubert* motion and, in fact, both he and Dersch admitted they had never filed a *Daubert* motion in any of their cases. Morrison testified they relied on Dr. Wigren to tell them if they needed to file a *Daubert* motion. When asked if he regretted not filing a *Daubert* motion, Morrison said, "Yes." Dersch testified that, in hindsight, filing a *Daubert* motion would have been a good idea. She also testified they made no strategic decision to forgo filing a *Daubert* motion but, instead, she never considered it. She said it never came up in their discussions.

When asked about Dr. Wigren's testimony that trial counsel never asked him to address Dr. Mitchell's theory, Morrison stated that he had asked Dr. Wigren about Dr. Mitchell's theory, but Dr. Wigren never responded and instead focused on the age of O.O.'s skull fracture. Morrison admitted they never asked Dr. Wigren for something they could use to cross-examine Dr. Mitchell about his theory on cause of death.

The first time trial counsel met Dr. Wigren was when he flew in on the Sunday after trial had begun, the night before he testified. During this meeting, Dr. Wigren asked counsel if they had hired a biomechanical engineer to testify. Morrison responded by saying, "'It's a little late, Doc.'" Morrison and Dersch both testified the first time Dr. Wigren discussed the reliability or general acceptability of Dr. Mitchell's theory was during this meeting. They said he told them he did not believe Dr. Mitchell's theory, basically calling it nonsense. Despite this knowledge, they never asked Dr. Wigren to express any opinions on Dr. Mitchell's depolarization theory at trial. Morrison's explanation for not doing so was that he was uncertain what Dr. Wigren might say.

Besides failing to challenge Dr. Mitchell's depolarization theory, with both a *Daubert* motion and expert testimony, Buchhorn also pointed out her trial counsel failed

9

to elicit explanatory testimony from Dr. Wigren at trial, after his responses to the State's cross-examination suggested he agreed with Dr. Mitchell's depolarization theory. Buchhorn's new counsel pointed to the following exchange between Dr. Wigren and the State:

> "Q. [State's attorney C.J. Reig:] Would you agree that a child could suffer physical violence to their head that would change the electroconductivity to the brain and they would stop breathing? Yes or no.
> "A. [Dr. Wigren:] Yes, with an explanation.
> "Q So—thank you. The answer is yes.
> "A. With explanation.
> "Q. That's what—your client can come and ask questions if they want to.
> "MS. RIEG: Do you agree, Judge?
> "THE COURT: Well, I was going to tell the doctor that there can be a redirect to explain or expand on that."

Trial counsel's redirect of Dr. Wigren was very brief and did not address this issue. Thus, Dr. Wigren was never allowed to give the jury his explanation of the qualification to his answer.

Buchhorn's new counsel asked Dr. Wigren to provide this explanation at the evidentiary hearing on their posttrial motions. Dr. Wigren testified that while physical violence can change the electroconductivity of the brain and stop breathing, the impact in those situations is more violent than a skull fracture and this "very violent impact" would cause perceptible injury to the brain. The example he provided of this phenomenon was "crushing head injuries like in an occupational accident."

The trial court denied Buchhorn's motion for a new trial. It found Buchhorn's counsel was not ineffective for failing to request a *Daubert* hearing because the court held it would have denied a *Daubert* motion to exclude Dr. Mitchell's testimony. The

10

court found Buchhorn's counsel was not ineffective in hiring Dr. Wigren because the court found counsel appropriately relied on Dr. Wigren's expertise and knowledge. The court noted Dr. Wigren's theory on cause of death directly contradicted the State's theory. The court discounted Craig's testimony because the court found it depended on the incorrect assumption that trial counsel would be able to exclude Dr. Mitchell's testimony. The court found Craig improperly based her testimony on hindsight. The court also relied heavily upon the considerable expertise of trial counsel. The court pointed out they were very prepared, appeared to have formulated a potentially winning strategy, and appeared to have spent considerable time with their client. The court rejected Buchhorn's other claims and sentenced her to 123 months' imprisonment.

ANALYSIS

On appeal, Buchhorn argues the trial court abused its discretion when it denied her posttrial motion because (1) Dr. Mitchell's testimony was unreliable and should have been excluded under K.S.A. 60-456(b) and (2) Buchhorn's trial counsel was ineffective and prejudiced her right to a fair trial. Buchhorn has raised other grounds for reversing her conviction, which we need not address because we reverse her conviction for ineffective assistance of trial counsel.

The trial court may grant a new trial when it is "required in the interest of justice." K.S.A 2020 Supp. 22-3501(1). We review this decision for an abuse of discretion. Generally, a trial court abuses its discretion when its decision is found to be arbitrary, fanciful, or unreasonable, or based on an error of fact or law. *State v. Ashley*, 306 Kan. 642, 650, 396 P.3d 92 (2017). The decision must be such that no reasonable person would have arrived at the same outcome. *State v. Jolly*, 301 Kan. 313, 325, 342 P.3d 935 (2015).

11

*Buchhorn failed to preserve her objections to the admissibility of Dr. Mitchell's testimony.*

Buchhorn challenges the admissibility of Dr. Mitchell's testimony under K.S.A. 60-456, which codifies the test for admissibility of expert opinion set forth in *Daubert*, 509 U.S. 579. *Daubert* established a "gatekeeper" function for trial courts, which requires the court to assess the reasoning and methodology underlying a proposed expert's opinion and determine whether it is scientifically valid and applicable to the particular set of facts involved in the case. The purpose of the *Daubert* analysis is to "'determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.'" *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (citing *Daubert*, 509 U.S. at 592). In this respect, Buchhorn argues the district court's decision to admit Dr. Mitchell's testimony at trial created a freestanding error of such gravity that it requires reversal of her conviction.

The problem with Buchhorn's challenge is it is untimely. Buchhorn never objected to the admissibility of Dr. Mitchell's opinions, including his methodology and conclusions, until her posttrial motion. The purpose of the gatekeeper function in K.S.A. 2020 Supp. 60-456 and under *Daubert* is lost once the evidence at issue has passed through the gate. Indeed, K.S.A. 2020 Supp. 60-457(b) recognizes the importance of timing in this area by allowing the court to hold a pretrial hearing to determine whether a witness qualifies as an expert and whether the witness' testimony satisfies the requirements of K.S.A. 2020 Supp. 60-456(b). Buchhorn's challenge to Dr. Mitchell's testimony falls within the provisions of K.S.A. 2020 Supp. 60-456(b), yet she did not object to Dr. Mitchell's testimony before or during the trial.

Until the Kansas Legislature codified the *Daubert* test in K.S.A. 2014 Supp. 60-456 through K.S.A. 2014 Supp. 60-458, Kansas courts applied the *Frye* test to the

12

admission of scientific expert testimony. *In re Care & Treatment of Jimenez*, No, 115,297, 2017 WL 1035505, at *3 (Kan. App. 2017) (unpublished opinion). Kansas courts routinely rejected challenges to scientific evidence under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) absent a timely and specific objection at trial. *State v. Ordway*, 261 Kan. 776, 801, 934 P.2d 94 (1997); *Ohlmeier v. Jones*, 51 Kan. App. 2d 1014, 1019, 360 P.3d 447 (2015). Further, K.S.A. 60-404 prohibits setting aside a verdict or reversing a decision because of the erroneous admission of evidence without a timely and specific objection.

The State appropriately notes our Supreme Court strictly adheres to the contemporaneous objection rule. See, e.g., *State v. Solis*, 305 Kan. 55, 62-63, 378 P.3d 532 (2016). It also correctly points out the purpose of this rule "is not fulfilled when the objection is first raised after the trial has been completed." *State v. Cook*, 286 Kan. 1098, 1109, 191 P.3d 294 (2008). Certainly, the purpose of the *Daubert* test is not fulfilled when the objection is first raised well after the jury has already heard and considered the allegedly suspect testimony in rendering its verdict. We find Buchhorn has failed to properly preserve her objection to the admissibility of Dr. Mitchell's testimony and decline to overturn the trial court's denial of Buchhorn's motion on that basis.

*Buchhorn's trial counsel was ineffective and prejudiced her right to a fair trial.*

The Sixth Amendment to the United States Constitution guarantees an accused the right to have assistance of counsel for his or her defense. *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014). The Fourteenth Amendment to the United States Constitution applies this right to state proceedings. The guarantee includes not only the presence of counsel but counsel's effective assistance as well. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]). The purpose of the effective assistance guarantee

is to ensure the accused receives a fair trial. *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012).

An allegation of ineffective assistance of counsel presents both questions of fact and law. When the trial court conducts a full evidentiary hearing on the claim, we must determine whether the court's findings are supported by substantial competent evidence and whether the court's factual findings support their legal conclusions. The standard of review when evaluating the court's legal conclusions is de novo. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

The Kansas Supreme Court recently recounted the two-prong test for analyzing ineffective assistance of counsel claims in *Khalil-Alsalaami v. State*, 313 Kan. 472, 485-86, 486 P.3d 1216 (2021):

> "'*Strickland* established a two-prong test for determining if a criminal defendant's Sixth Amendment right to effective assistance of counsel has been violated by an attorney's performance. 466 U.S. at 687-96. Kansas courts adopted this test in *Chamberlain* [*v. State*], 236 Kan. [650,] 656-57[, 694 P.2d 468 (1985)]. Under the first prong, a defendant must demonstrate that counsel's performance was deficient. 236 Kan. at 656. If so, the court moves to the second prong and determines whether there is a reasonable probability that, without counsel's unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 694.' *State v. Betancourt*, 301 Kan. 282, 306, 342 P.3d 916 (2015).
> "To establish deficient performance under the first prong, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.' *Strickland*, 466 U.S. at 688. Courts must remain mindful that their scrutiny of an attorney's past performance is highly deferential and viewed contextually, free from the distorting effects of hindsight:
> > "'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess

counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citations omitted.]' 466 U.S. at 689.

"Under *Strickland*'s second prong, defendants must show the deficient performance of counsel was prejudicial. To do so, defendant must establish with reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. *Edgar v. State*, 294 Kan. 828, 838, 283 P.3d 152 (2012). '"A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."' 294 Kan. at 838."

Although the above principles should guide our decision, they are not mechanical rules. In fact, the ultimate focus must be on the defendant's right to fundamental fairness in the proceeding. "In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. The Kansas Supreme Court has long recognized that a criminal defendant "is entitled to a fair trial but not a perfect one." *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013)

15

1. *Buchhorn's trial counsel was deficient in failing to investigate Dr. Mitchell's depolarization theory.*

Buchhorn's lawyers argue that her trial counsel's handling of Dr. Mitchell's testimony and the overall matter of expert testimony on the cause of death fell below the constitutional standard of adequate representation and deprived her of a fair trial. In other words, had the trial lawyers sufficiently prepared, they could have excluded Dr. Mitchell's testimony altogether or so undermined its credibility in the eyes of the jurors that the jury would have been left with at least a reasonable doubt about Buchhorn's guilt. We agree and reverse on this basis.

Under the circumstances, Buchhorn's trial counsel's conduct was objectively unreasonable. There is no question Dr. Mitchell's depolarization theory was central to the State's case. It was the linchpin that tied Buchhorn to O.O.'s death. This observation is not hindsight; it stems from information counsel knew before trial. Yet Buchhorn's counsel admit they did not independently research or investigate his theory.

If Buchhorn's counsel had inquired into Dr. Mitchell's theory at the preliminary hearing, studied it on their own, or properly explored it with their expert, they most likely would have discovered evidence to assist in a more effective cross-examination of Dr. Mitchell at trial and to better prepare Dr. Wigren to address Dr. Mitchell's opinions. Further, any of these investigative options could have prompted them to realize they needed to engage additional experts to attack Dr. Mitchell's theory or at least ensure Dr. Wigren addressed it at trial. For instance, if they had questioned Dr. Mitchell about the scientific basis for his theory, they would most likely have learned the "statistics" on which he relied were flimsy and his medical literature provided tenuous support, at best. This evidence would have been powerful on cross-examination, particularly since the matter hinged on the credibility of both sides' expert theories.

16

Although counsel's "[s]trategic choices based on a thorough investigation of the law and facts are virtually unchallengeable," when determining an ineffective assistance of counsel claim, uninformed decisions are not similarly protected. *Flynn v. State*, 281 Kan. 1154, Syl. ¶ 5, 136 P.3d 909 (2006); *Mullins v. State*, 30 Kan. App. 2d 711, 716-17, 46 P.3d 1222 (2002). Here, trial counsel lacked sufficient information to make an informed decision about how to address Dr. Mitchell's depolarization theory. Their failure to investigate this theory at or after the preliminary hearing, or explore it with their medical expert, bars any characterization of their deficiencies as "trial strategy."

Professor Craig testified, "To be able to say that the choices counsel made at trial were strategic, they have to be based on a thorough investigation. And part of that thorough investigation would be researching the issue, developing your experts, making sure your experts had all of the information that they might need." Her point is well taken. Buchhorn's counsel did not investigate Dr. Mitchell's theory on their own, with Dr. Mitchell (through examination at the preliminary hearing or trial), with Dr. Wigren, or with any other expert or consultant. They did not develop any expert testimony to address this theory, nor did they procure any information to provide Dr. Wigren about the factual or scientific basis for Dr. Mitchell's theory or on which to cross-examine Dr. Mitchell. It cannot be said that Buchhorn's counsel made an informed decision not to present testimony that was never discussed or evidence they never sought.

Buchhorn's trial counsel had never met Dr. Wigren or worked with him in the past. They admitted he was difficult to get ahold of. While they claim they "took direction from" him on medical issues, Dr. Wigren testified they never brought up depolarization with him. Trial counsel claim they asked him about it but admit he did not answer their questions and, instead, discussed an alternate theory. If their expert was unavailable or evasive, it was up to counsel to get the necessary answers or replace or supplement that expert. Morrison's admission that he did not ask Dr. Wigren about depolarization at trial *because he did not know what he would say* is telling.

17

At best, counsel relied exclusively upon an expert with whom they had no relationship, was difficult to get ahold of, and evaded answering questions about the State's key theory of the case. At worst, counsel did not address this key theory with Dr. Wigren until trial had begun and, even then, did not ask him to express his opinions on this theory once he told them what those opinions were—and most particularly after the State opened the door in cross-examining Dr. Wigren.

The trial court erred in finding it was reasonable for Buchhorn's counsel to rely upon Dr. Wigren to define the medical issues they needed to address. The ultimate control of a case rests with the lawyers and not the expert witnesses. It is incumbent upon the lawyers to define clearly for the experts the scope of their assigned tasks. Here, the communication channel broke down. The lawyers expected Dr. Wigren to tell them everything they needed to know about O.O.'s death and Dr. Mitchell's theory on causation. Dr. Wigren, however, apparently understood his engagement far more narrowly and offered an expert opinion on the skull fracture and possible causes of death rather than a critique of Dr. Mitchell's theory.

There is a difference between relying on an expert and scapegoating one. Here, counsel blamed Dr. Wigren for not telling them (1) Dr. Mitchell's depolarization theory had no medical basis or support in the medical community, (2) they needed to hire other experts to address depolarization, and (3) they should file a *Daubert* motion to exclude Dr. Mitchell's theory. Yet the record reveals they did not explore these issues with Dr. Wigren. It was unreasonable for counsel to expect Dr. Wigren to provide this guidance when they failed to request it.

Just like counsel cannot be said to have made an informed decision when they lacked the information needed to make the decision, they cannot be said to have relied on an expert for advice they never sought (or, according to them, did not receive when requested). Even if we accept the concept that counsel's reliance on their medical expert

18

to take the lead and suggest legal strategy was reasonable, counsel still cannot shirk their professional responsibilities onto an unfamiliar, retained expert without giving that expert the necessary tools to shoulder those responsibilities. Dr. Wigren testified he did not realize depolarization was a significant issue in the case, and he was not given the preliminary hearing transcript where Dr. Mitchell discussed it. It is difficult to imagine when Dr. Wigren was supposed to provide this pretrial advice when counsel admit the first time they substantively discussed depolarization with him was during their mid-trial meeting.

Both parties cite *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008), in support of their respective positions, and we agree it is pertinent. In *Wilson*, the court considered whether "trial counsel was ineffective because of his poor investigation in preparation for the sentencing phase and his failure to put on relevant mitigating evidence at trial." 536 F.3d at 1083. While the trial counsel in *Wilson* interviewed witnesses to testify as to Wilson's character, trial counsel failed to interview Wilson's family members and therefore failed to gather a complete narrative of Wilson's life. In its analysis, the court determined "the question is not whether counsel did *something*; counsel must conduct a full investigation and pursue reasonable leads when they become evident." 536 F.3d at 1084.

*Wilson* recognized that "in many situations, the expert will know better than counsel what evidence is pertinent to mental health diagnoses and will be more equipped to determine what avenues of investigation are likely to result in fruitful information." 536 F.3d at 1089. But *Wilson* took this further to find that while trial counsel should be able to rely on their expert to a degree, trial counsel "may not simply hire an expert and then abandon all further responsibility [to investigate]." 536 F.3d at 1089. Ultimately, the court in *Wilson* found that trial counsel's preparation fell below acceptable standards and was therefore deficient. 536 F.3d at 1089.

Buchhorn's trial counsel was similarly deficient. Once they hired Dr. Wigren, their duty to investigate the State's main theory did not end there. They failed to utilize his expertise to address depolarization, either with them or the jury. They also pursued no information about the factual or medical basis for Dr. Mitchell's theory. Instead, they simply hired Dr. Wigren without providing him the necessary information and guidance to make the decisions on which they were apparently relying on him to make.

Buchhorn also relies on *Robinson v. State*, 56 Kan. App. 2d 211, 428 P.3d 225 (2018), to argue her trial counsel could not blame Dr. Wigren for their failure to fully investigate Dr. Mitchell's theory. In *Robinson*, Frank Robinson was convicted of aggravated arson and felony murder based on the testimony of the government's fire investigator, Agent Douglas Monty. The trial court found Robinson's trial counsel was ineffective for failing to properly investigate "a most important aspect of this case—fire cause and origin expert opinions" and for failing to present sufficient expert testimony to refute claims made by the State's fire investigators. 56 Kan. App. 2d at 227. Robinson's attorney did not hire an arson expert to testify at trial, and he only consulted with an "'arson investigation-type expert, cause and origin person'" less than two weeks before trial. 56 Kan. App. 2d at 216. After that person proved unhelpful, Robinson's attorney conducted no further investigation and then did not talk to another expert.

In affirming the trial court's decision, this court noted the importance of thoroughly investigating both the facts and expert opinions to prepare a proper defense. See 56 Kan. App. 2d at 227-30. As in *Robinson*, Buchhorn's counsel did not properly investigate the central issue in her case, which was Dr. Mitchell's theory on cause of death. And, also like *Robinson*, if Buchhorn's counsel had properly investigated Dr. Mitchell's expert opinions, they would have been able to undermine those opinions far more effectively. This court's description of *Robinson*'s counsel's failings is just as apt here. By failing to independently investigate Dr. Mitchell's theory and by failing to marshal expert evidence to directly challenge that theory, Buchhorn's counsel entered

20

"battle with the State unarmed and unequipped with the expertise [Buchhorn] needed for a defense." 56 Kan. App. 2d at 227.

As in *Robinson*, Buchhorn's counsel may have acted reasonably when they first hired Dr. Wigren to contest the timing of O.O.'s skull fracture. Still, just as the expert in *Robinson* was not qualified to refute the most important issue of the case, Dr. Wigren was not a neurological expert who could fully refute Dr. Mitchell's theory of instant death caused by the depolarization of nerves from blunt force trauma. And, like in *Robinson*, Buchhorn's counsel failed to make a comprehensive investigation of Dr. Mitchell's medical opinions, thus failing to equip Buchhorn with what she needed for a proper defense. It was not a reasonable strategy that led counsel to decline to investigate Dr. Mitchell's theory, but, rather, lack of thoroughness and preparation. See *Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir. 1991).

2. *Buchhorn's trial counsel was deficient in failing to present responsive expert testimony at trial.*

Buchhorn also claims her counsel was ineffective for failing to directly challenge Dr. Mitchell's depolarization theory with expert testimony. She presented examples of such testimony at the posttrial hearing, in the form of Dr. Kessler and Dr. Ng. These highly qualified medical professionals testified that Dr. Mitchell's depolarization theory had no support in science or the medical community, and that the facts of the case did not support his theory on O.O.'s cause of death. Such evidence would have severely undermined Dr. Mitchell's credibility and the State's theory of the case.

In deciding Buchhorn's counsel was not ineffective for failing to engage such experts, the trial court relied on the considerable experience of trial counsel. She found it reasonable for counsel to rely upon Dr. Wigren to tell them if they needed additional experts. While it is true that the decision whether to call a particular witness rests within

21

the sound discretion of trial counsel, this decision must be an "*informed, tactical*" one. *United States v. Holder*, 410 F.3d 651, 655 (10th Cir. 2005). Here Buchhorn's trial counsel failed to provide a "valid strategic reason" for simply relying on Dr. Wigren to tell them whether they needed more experts. See *Robinson*, 56 Kan. App. 2d at 228. As explained above, counsel's decision to blindly rely on Dr. Wigren was uninformed and objectively unreasonable.

Professor Craig testified that Buchhorn's counsel could not effectively cross-examine Dr. Mitchell without proper experts. She also testified trial counsel did not adequately challenge the State's theory of O.O.'s cause of death. While she acknowledged that counsel hired Dr. Wigren, a forensic pathologist, she still believed a neurologist was necessary to testify in this case. Indeed, even Dr. Mitchell admitted in the preliminary hearing that a neuropathologist may disagree with some of his medical findings.

Trial counsel admitted the only time they specifically discussed other experts with Dr. Wigren was when he flew in on the Sunday after trial had begun, the night before he testified. While counsel fault Dr. Wigren for not bringing the need for other experts to their attention earlier, they fail to acknowledge their responsibility to directly address this issue with him. It was counsel's duty to ensure their expert addressed all necessary issues, particularly since they conducted no independent investigation on their own. Rather than making an informed decision on the expert testimony required to counter Dr. Mitchell's theory, counsel simply abrogated their responsibility to Dr. Wigren, a witness with whom they had never worked, had never met, and who they complained was difficult to get ahold of.

Under *Wilson*, once counsel knew Dr. Mitchell's theory on cause of death from the preliminary hearing, they had an obligation to properly investigate that theory. Further, under *Robinson*, Buchhorn's counsel should have hired an expert who could properly refute the most important issue of the case—Dr. Mitchell's theory on depolarization of

nerves. Buchhorn's counsel's performance fell "below an objective standard of reasonableness, considering all the circumstances." See *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007). Trial counsel's failure to use expert testimony to challenge the validity of Dr. Mitchell's theory and to explain how Dr. Mitchell's theory was false or not credible was objectively unreasonable.

Using the *Strickland* analysis, Buchhorn must establish her counsel's actions were deficient under the totality of the circumstances. *Bledsoe*, 283 Kan. at 90; see *Strickland*, 466 U.S. at 687. Here, that burden is met.

*3. Trial counsel's deficient performance prejudiced Buchhorn's right to a fair trial.*

As we have said, under the *Strickland* test for ineffective assistance of counsel, Buchhorn must establish that her counsel's objectively unreasonable performance caused her material prejudice. To establish prejudice, Buchhorn must show a reasonable probability that her counsel's deficient performance affected the outcome of the proceedings, based on the totality of the evidence. A reasonable probability here is a probability sufficient to undermine confidence in the outcome. *Khalil-Alsalaami*, 313 Kan. at 485.

As in *Mullins*, 30 Kan. App. 2d at 717, the trial court did not analyze the prejudice prong of the *Strickland* test. Instead, its analysis stopped after finding counsel was not ineffective. We analyze this prong based on the facts in the record before us, just as this court did in *Mullins*.

There was no physical evidence tying Buchhorn to the death, which meant the trial turned on credibility between the prosecution and defense witnesses. The State built its case on the expert testimony given by Dr. Mitchell. This makes an investigation into Dr. Mitchell's theory on cause of death the most important aspect of Buchhorn's defense.

23

Buchhorn's counsel had a duty to investigate Dr. Mitchell's theory to give her the most effective defense. See *McHenry v. State*, 39 Kan. App. 2d 117, 123, 177 P.3d 981 (2008). Their failure to investigate the State's main theory meant they were unprepared to fulfill that fundamental constitutional obligation.

In *Mullins*, this court found trial attorneys' failure to consult or procure an expert was objectively unreasonable because there was no showing of strategic reasons for that failure. *Mullins* also found that "[h]ad trial counsel procured the services of an available expert . . . the jury would have been presented with relatively strong evidence to potentially undermine the allegations . . . ." 30 Kan. App. 2d at 717. This court also held that "because trial counsel failed to present . . . such available expert testimony, the jury heard only the victim's unchallenged allegations." 30 Kan. App. 2d at 718.

Just like in *Mullins*, Buchhorn's counsel could have undermined Dr. Mitchell's theory with information they could have discovered at the preliminary hearing, from their own independent investigation, and from properly managed experts (including Dr. Wigren). If counsel had directly challenged Dr. Mitchell's theory, such as by presenting testimony from Dr. Kessler or Dr. Ng (or both), or if Dr. Wigren had directly addressed it, there is a reasonable probability the jury would have found Buchhorn not guilty. The State's entire theory of guilt relied on Dr. Mitchell's opinion that the death was immediate, yet trial counsel did not directly challenge that theory.

Trial counsel's failure to independently investigate Dr. Mitchell's theory also left them unprepared to challenge the credibility of that theory on cross-examination. "'While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators.'" *United States v. Cronic*, 466 U.S. 648, 656, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Buchhorn could have entered the trial armed with direct evidence to impeach Dr. Mitchell's theory on the cause of death and the State's entire theory of guilt. Instead, trial counsel was

24

unprepared to test the validity of Dr. Mitchell's theory, despite counsel's admission that Dr. Mitchell's opinions were key to the State's case.

When setting forth the very test we apply today, the United States Supreme Court pointed out, "a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Strickland*, 466 U.S. at 685. Dr. Mitchell's depolarization theory was not subjected to effective or even fully formed adversarial testing. If the jury did not believe that theory, there is nothing left in the State's case against Buchhorn, just like in *Robinson*. It was Dr. Mitchell's opinion that O.O.'s death was instantaneous that tied the death to Buchhorn, as the last person who admitted having contact with O.O. If that opinion was impeached, a finding of guilt becomes highly questionable. See *Robinson*, 56 Kan. App. 2d at 229.

Based on the totality of the circumstances, we are not confident the outcome would have remained unchanged if the jury had been apprised of all the information Buchhorn's counsel could have presented to impeach Dr. Mitchell's opinions.

*Trial court remarks during voir dire*

Since the errors we have identified above prejudiced Buchhorn, we need not consider any of her other allegations. See *State v. Stinson*, 43 Kan. App. 2d 468, 469, 227 P.3d 11 (2010) (finding that because court was reversing and remanding for new trial, remaining argument on ineffective assistance of counsel was moot). However, there is one matter we feel compelled to address, even though we do not base our decision upon it.

Buchhorn also took issue in her posttrial motion with the trial court's remarks at the close of jury orientation. She reprises those concerns on appeal. The court told the jury panel:

> "Okay. Anybody ever been at Thanksgiving dinner and your crotchety old uncle says, 'I just don't understand why the defendants have all the rights and victims have none?' Anybody ever heard anybody made those statements? I see people smiling and won't admit it, but they have heard it. Anybody know why we are set up that way? Well, because the people who wrote our Constitution were criminals. They had been charged with treason; and if they had been found guilty, they would have been hanged to death, and they wrote our Constitution in a way that they would have wanted to be protected when they went to trial."

Buchhorn's trial counsel did not object to these remarks. Her new counsel argued these remarks were factually inaccurate and constituted judicial misconduct, denying Buchhorn a fair trial. The district court did not address this argument in its order.

Frankly, we fail to see the purpose of these remarks, which neither assist the prospective jurors in understanding what will be expected of them if they are chosen to serve nor impart to them some legal principle applicable to the criminal justice process. And Buchhorn is absolutely correct that such remarks vitiate the importance of the constitutional protections afforded an accused (and, indeed, all citizens). At the outset of the trial, the district court told the prospective jurors that Buchhorn, as a criminal defendant, had all kinds of rights and O.O., the victim, had none. We see no productive value in unfavorably contrasting persons accused of crimes with victims of crimes, particularly since it risks providing the jury an improper analytical framework to process the evidence admitted at trial. In short, the trial judge's remarks were imprudent and should not have been made.

In closing, we hearken back to the sage observations made by the *Robinson* court. 56 Kan. App. 2d at 212. It is not an easy decision to grant a new trial to someone who has been convicted of killing another human being. But more important than the severity of the crime is the fundamental principle of American law—all accused must receive a fair trial, even those accused of killing a child. That legal principle has guided our decision to order a new trial for Carrody M. Buchhorn.

Reversed and remanded.