NOT DESIGNATED FOR PUBLICATION

No. 127,659

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEREMY FILBERT,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; COURTNEY MIKESIC, judge. Oral argument held May 20, 2025. Opinion filed August 22, 2025. Reversed and remanded with directions.

*Jonathan Laurans*, of Kansas City, Missouri, for appellant.

*Kayla L. Roehler*, deputy district attorney, *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., CLINE and COBLE, JJ.

PER CURIAM: Jeremy Filbert was convicted of sex crimes against J.F., his 12-year-old half-sister. In November 2020, Filbert filed a motion under K.S.A. 60-1507, alleging that his trial attorney provided constitutionally deficient representation. Filbert alleged his attorney failed to properly investigate and challenge the State's expert witness and the individual who interviewed J.F. about the allegations. Filbert also alleged his attorney should have offered medical records into evidence which demonstrated Filbert's impotence. The district court summarily denied the motion, but this court reversed that decision and remanded the matter for an evidentiary hearing on Filbert's claims. *Filbert v.*

1

*State*, No. 125,155, 2023 WL 3563438, at *1, 9 (Kan. App. 2023) (unpublished opinion). The district court denied Filbert's motion after a hearing, which is the decision that is the subject of this appeal.

We find Filbert's claims have merit and, as a result, reverse his convictions and remand the matter to the district court. Filbert has demonstrated his counsel's representation was constitutionally deficient and, as a result, there is a real probability the jury would have reached a different verdict absent these deficiencies.

FACTUAL AND PROCEDURAL BACKGROUND

We described the underlying facts of Filbert's criminal convictions, his 60-1507 motion, and the district court's summary denial of that motion in *Filbert*:

"Filbert was convicted of sex crimes against J.F., his 12-year-old half-sister. The abuse surfaced in September 2015 after Filbert, who was 27, made comments to a coworker about J.F. that suggested Filbert was interested in a sexual relationship with her. Concerned, the coworker secretly recorded one of these conversations and alerted their supervisor. Filbert did not confess to sexually abusing J.F. in these conversations, but he expressed a potential desire to do so.

"After the coworker's disclosure, the Kansas Department for Children and Families (DCF) sent someone to investigate the situation. When asked about any inappropriate behavior by Filbert, J.F. disclosed that he had sexually abused her regularly since he had moved into the family home a few months earlier. This abuse included multiple instances of penetrative vaginal sex, from around May 2015 up until a few days before this conversation with DCF in September 2015. Besides this several-month period of abuse, J.F. also said that Filbert had inappropriately touched her once in 2012 and exposed himself to her once earlier in 2015.

"A few weeks after DCF received these initial disclosures, J.F. participated in a videotaped forensic interview with Erin Miller-Weiss, a social worker and child-

2

interview specialist. In this interview, J.F. disclosed in more detail being raped and sodomized by Filbert in the family home and barn over the summer of 2015. J.F. also stated that Filbert took pictures on his phone of her getting out of the shower and in sexual positions.

"A week after the forensic interview, J.F. had a physical examination with Dr. Terra Frazier, a child-abuse pediatrician at Children's Mercy Hospital. Physically, J.F. presented as normal overall. Her hymen was intact, with a 'deep notch' on the bottom left part of it. According to Dr. Frazier, there is 'no expert consensus opinion' about notches like this, which could result from trauma or just be a natural feature the child is born with. Thus, Dr. Frazier could not say whether the notch resulted from sexual abuse, some other cause, or whether J.F. was born with it. Dr. Frazier thus diagnosed J.F. with child sexual abuse based solely on J.F.'s disclosures.

"As part of the criminal investigation, Kansas City, Kansas police searched the home and barn where J.F. stated the abuse occurred, but the search yielded no forensic evidence of sexual abuse. Police also found no evidence of sex crimes on Filbert's phone.

"The State then charged Filbert with multiple counts of rape, aggravated criminal sodomy, and aggravated indecent liberties with a child. Filbert's attorney throughout the investigation and prosecution was Carl Cornwell.

"*Filbert's trial and convictions*

"The case went to a jury trial in October 2016, about a year after J.F. disclosed the sexual abuse. Before trial, the State had notified Cornwell that it intended to present expert testimony from Dr. Frazier and Miller-Weiss—the forensic interviewer. Cornwell did not file any pretrial objections to this testimony or request a hearing to examine either witness' qualifications or reliability.

"Before jury selection on the first day of trial, the State specified that Dr. Frazier would testify that 95% of child-sex-abuse physical examinations show normal findings and that the best evidence of abuse is the child's disclosures. Cornwell objected to the testimony about relying on disclosures but did not challenge the 95% testimony. As to

3

Miller-Weiss, Cornwell argued that her testimony did not involve expert matters and thus she should only be a fact witness. After some discussion, the district court made no definitive ruling on these issues—though it strongly suggested that Miller-Weiss was not an expert—and as to Dr. Frazier, Cornwell stated he would 'just wait until we get there' to see what the testimony would be.

"Dr. Frazier later testified about her examination of J.F. and the normal findings for J.F.'s genitalia. As expected, Dr. Frazier explained that an intact hymen does not mean there was no sexual contact, stating that '90 to 95 percent of the time, even after multiple episodes of penetrative vaginal sexual contact, the hymen is normal.' She explained that these numbers were 'national statistics based on research' from 'various studies.' And she confirmed that J.F.'s child-sexual-abuse diagnosis was thus based on her disclosures, or the 'history provided.' Cornwell did not object to this testimony or address these statistics during his brief cross-examination of Dr. Frazier.

"Miller-Weiss also testified. Given the district court's ambiguous pretrial comments, it was unclear whether Miller-Weiss was testifying as an expert or a lay witness, though earlier that day a detective had testified that the child interviewers in sex-abuse cases are expert witnesses. Miller-Weiss testified about her own qualifications—including testifying as an expert in multiple other cases—interview methods, and her interview with J.F. The jury then watched a video of the interview. Cornwell did not object to Miller-Weiss' testimony, and his brief cross-examination did not address her qualifications or interview methods.

"Along with the video of the forensic interview, the jury heard live testimony from J.F., who described the sexual abuse. J.F. reiterated that Filbert had raped and sodomized her over a several-month period and that he had sexually abused her on the two earlier occasions. She also testified that she knew what an erection was and that she was 'pretty sure' Filbert had one when he abused her.

"Filbert presented two witnesses—himself and his ex-girlfriend. His ex-girlfriend testified that Filbert could not get an erection and that they tried to have sex many times but never could because of this issue. Filbert also testified about his impotence, which resulted from a back injury during his military service. He had received erectile-

disfunction pills but testified that they did not work so he gave them to his father. Filbert's father and one of Filbert's brothers, who were both called as witnesses for the State, corroborated this testimony: Filbert's father confirmed that Filbert had given him the medication, and both the father and brother testified that Filbert had discussed his impotence with them. According to the brother, Filbert told him that he 'couldn't feel anything down there' and that he could get an erection but would not feel it.

"The jury convicted Filbert of two counts of rape, three counts of aggravated criminal sodomy, and one count of aggravated indecent liberties with a child. The district court imposed concurrent life sentences on each count, with no possibility of parole for 25 years. On direct appeal, this court affirmed Filbert's convictions and sentences. *State v. Filbert*, No. 117,326, 2018 WL 2375261 (Kan. App. 2018) (unpublished opinion), *rev. dismissed as improvidently granted* 311 Kan. 1047 (2020).

"*Filbert's K.S.A. 60-1507 motion*

"In November 2020, Filbert filed a motion under K.S.A. 60-1507, alleging that his trial attorney, Cornwell, provided constitutionally deficient representation. Relevant here, Filbert claimed:

- Cornwell failed to properly investigate and challenge Dr. Frazier's testimony and consult an expert to rebut her medical opinions. In support, Filbert attached a report from Dr. Gregory Gilbert, a physician and Stanford Medical School professor who disputed many of Dr. Frazier's conclusions, calling her testimony that 90-95% of child rape victims do not show any physical signs of abuse 'inaccurate' and disputing her diagnosis. Dr. Gilbert attested that he—along with other physicians he knows—would have testified to the same at Filbert's trial.
- Cornwell failed to properly investigate and challenge Miller-Weiss' testimony and her child-interview techniques and consult an expert to rebut her testimony. In support, Filbert attached a report from Dr. Robert Barnett, a Kansas psychologist who claimed that Miller-Weiss' interview techniques were suggestive and based on a discredited protocol that is not peer reviewed, thus making the forensic interview 'open to criticism.'

- Cornwell failed to present corroborating evidence of Filbert's impotence. In support, Filbert attached paperwork from the Department of Veterans Affairs (VA) noting that he had erectile dysfunction, which he asserts would have lent credibility to the testimony about his impotence.
- Cumulative error when considering all of Cornwell's missteps together.

"The State never responded to Filbert's motion, and in February 2022 the district court summarily denied it without holding a hearing. The judge that rejected Filbert's K.S.A. 60-1507 motion also presided over his trial.

"In denying Filbert's motion, the district court found that his claims about Dr. Frazier's testimony lacked merit, characterizing Filbert's claims as 'broad and conclusory.' The court did not discuss the proffered evidence from Dr. Gilbert. As to the claim about Miller-Weiss' testimony, the district court found that she had not testified, or been requested to testify, as an expert—only as a fact witness, which Kansas law permits. And the court found that Dr. Barnett's report and opinions were unsupported in Kansas law, not credible, and would not have been admissible.

"The district court also found the claim about impotence documentation to lack merit, citing the fact that Cornwell presented other evidence on this point—through witness testimony—so more evidence about it would have made no difference. And because the court found Filbert's individual claims to lack merit, it rejected his cumulative-error claim." 2023 WL 3563438, at *1-3.

This court reversed and remanded the summary denial of Filbert's 60-1507 motion and ordered an evidentiary hearing on all three of Filbert's claims. *Filbert*, 2023 WL 3563438, at *1, 9. We held that an evidentiary hearing was necessary to determine what strategy, if any, was behind Cornwell's decision to not consult an expert to dispute Dr. Frazier's opinion and his strategy behind not moving to disqualify some of Dr. Frazier's opinions from being presented to the jury. 2023 WL 3563438, at *4-7. While we found that Filbert's claims about Miller-Weiss' expert designation lacked merit because she could have testified about her interview with J.F. as a fact witness, we nevertheless

6

remanded for an evidentiary hearing to explore why Cornwell did not consult an expert about Miller-Weiss' forensic-interviewing techniques used to obtain J.F.'s disclosures. 2023 WL 3563438, at *7-8. Lastly, we mandated an evidentiary hearing to consider why Cornwell did not present official documentation of Filbert's impotence that would have corroborated witness testimony and avoided credibility concerns that can come with live witnesses. 2023 WL 3563438, at *8-9.

On remand, the district court held an evidentiary hearing on Filbert's claims. Dr. Gilbert testified and opined, like he did in his report that supported Filbert's motion, that Dr. Frazier's conclusions were not the product of reliable principles and methods, her diagnosis of J.F. as a child sex abuse victim was inaccurate, and her testimony that 90-95% of child rape victims do not show any physical signs of abuse was also wrong. Dr. Barnett similarly confirmed his report during his testimony. He posited that Miller-Weiss had "an unusually large number of leading and suggestive questions." Dr. Barnett concluded that forensic interviewers should avoid leading questions because "it essentially coaches the child what to say." And he explained that the forensic interviewing protocol employed by interviewers, called "Finding Words," did not meet the standard under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), because it lacked scientific verification, reliability, and validity. He mentioned that Miller-Weiss' CV indicated she was trained in Finding Words.

Cornwell also testified at the hearing. He explained that he did not confer with or retain any experts to investigate Dr. Frazier or Miller-Weiss. He stated Dr. Frazier's testimony that J.F. had "an intact hymen [and] repeated rapes, seems to me that's pretty good for" the defense. He strategically wanted Dr. Frazier to testify that J.F. had an intact hymen. And he noted he did not challenge her testimony through *Daubert* because "she'd already been found to be an expert before." To investigate Miller-Weiss' forensic interview, he "probably showed it to somebody in [his] office" but did not confer with an

7

expert. His main reason for not wanting to challenge J.F.'s forensic interview was he wanted to point out inconsistencies in J.F.'s statements and disclosures to Miller-Weiss.

As to Filbert's impotence defense, Cornwell stated he did not admit Filbert's medical records that discussed Filbert's diagnosis of erectile dysfunction (ED) into evidence because the records stated Filbert's ED was not from his military injury. Cornwell believed that "would have hurt the [defense's] theory" that Filbert's injury was caused by his Navy injury.

The district court denied Filbert's 60-1507 motion. In dismissing all three of Filbert's arguments, it largely rested its decision on deference to Cornwell's strategic decisions. This appeal follows.

REVIEW OF FILBERT'S APPELLATE CHALLENGES

To prevail on a 60-1507 motion, a convicted defendant must show both that his or her legal representation "fell below an objective standard of reasonableness" guaranteed by the right to counsel in the Sixth Amendment to the United States Constitution and that, absent the substandard lawyering, there is "a reasonable probability" the outcome in the criminal case would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Phillips*, 312 Kan. 643, 676, 479 P.3d 176 (2021); *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014); see also *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985) (adopting and stating *Strickland* test for ineffective assistance). Reasonable representation demands that degree of "skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. A reasonable probability of a different outcome "undermine[s] confidence" in the result and marks the criminal proceeding as fundamentally unfair. 466 U.S. at 694. The movant, then, must prove both

8

constitutionally inadequate representation and sufficient prejudice attributable to that representation materially calling into question the resulting convictions.

As the United States Supreme Court and the Kansas Supreme Court have stressed, review of the representation should be deferential and hindsight criticism must be tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success notwithstanding demonstrable competence. See *Strickland*, 466 U.S. at 689-90; *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Rarely should a lawyer's representation be considered substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among arguably suitable options. *Strickland*, 466 U.S. at 690-91. Whether a lawyer made reasoned strategic decisions bears on the competence component of the *Strickland* test.

In general, courts look at a lawyer's overall performance in representing a criminal defendant in determining whether the Sixth Amendment right to counsel under the United States Constitution has been satisfied, meaning that a minor mistake or even a number of minor mistakes do not breach that duty. See *Harrington v. Richter*, 562 U.S. 86, 104-05, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Bland v. Hardy*, 672 F.3d 445, 450 (7th Cir. 2012) ("[T]he question under *Strickland* is not whether the lawyer made a mistake, even a serious one; it is whether the lawyer's *overall* performance was professionally competent."). But a single error causing sufficiently substantial legal harm to the defendant to call into question an adverse outcome at trial or on appeal will suffice. See *Miller v. State*, 298 Kan. 921, 938-39, 318 P.3d 155 (2014).

When reviewing a denial of a 60-1507 motion after a full evidentiary hearing, as here, this court must accept the district court's findings of fact as long as they are supported with substantial competent evidence. But this court exercises unlimited review

of the determinative legal issues. *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007).

I. *Did the district court err in finding Cornwell's approach to Dr. Frazier was not constitutionally defective?*

Filbert alleged in his 60-1507 motion and arguments on appeal that Cornwell was ineffective with respect to Dr. Frazier, for two reasons. First, Filbert takes issue with Dr. Frazier's diagnosis of J.F. as a "sexual abuse victim" (Diagnosis Conclusion) and her claim that 90-95% of child sex abuse victims show no injuries (Statistic Conclusion). Second, Filbert contends Cornwell should have consulted an expert to investigate and/or challenge Dr. Frazier's testimony and conclusions.

The district court was unpersuaded by these arguments because it found "Cornwell intentionally strategized not to hold a *Daubert* hearing because he wanted Dr. Frazier to testify about her findings before the jury." And it found Cornwell's strategy persuasive because he wanted Dr. Frazier's testimony admitted so he could highlight and have the jury question, "'[H]ow can a little girl with an intact hymen be repeatedly raped'"?

Filbert parses out his argument on this issue into several sections: The district court erred in finding Cornwell conducted a partial investigation into Dr. Frazier's testimony; the court failed to meaningfully address Dr. Frazier's Diagnosis and Statistic Conclusions; Dr. Gilbert explained Dr. Frazier's Diagnosis Conclusion was medically unsupported; Dr. Gilbert opined that Dr. Frazier's Statistic Conclusion would never have survived a *Daubert* hearing; the court erred in not finding Cornwell's performance deficient under *Strickland*; and the court erred when it failed to find Cornwell's performance prejudiced Filbert's trial.

10

Since the key tenants of the ineffective assistance of counsel test are founded in its two steps, we address Filbert's arguments through that vehicle: whether Cornwell's performance was deficient under the totality of the circumstances and whether there is a reasonable probability that the jury would have reached a different result absent the deficient performance.

A. *Cornwell's management of Dr. Frazier's testimony and opinions was deficient under the totality of the circumstances.*

Cornwell admitted he did not confer with or retain any experts to investigate Dr. Frazier. Even more problematically, his only investigation into Dr. Frazier was looking at her CV and "either [in] this case or another case . . . I called somebody else, some other attorney who had Frazier and [asked] did you get the same diagnosis? And they said, yeah."

Whether a defense counsel's approach to the State's expert witness constitutes ineffective assistance of counsel has been assessed by this court in *Robinson v. State*, 56 Kan. App. 211, 428 P.3d 225 (2018), and *State v. Buchhorn*, No. 122,252, 2021 WL 3578032 (Kan. App. 2021) (unpublished opinion), *aff'd by an equally divided court* 316 Kan. 324, 515 P.3d 282 (2022). In *Buchhorn*, we described the facts and law in *Robinson* and how it compared to Buchhorn's case:

> "In *Robinson*, Frank Robinson was convicted of aggravated arson and felony murder based on the testimony of the government's fire investigator, Agent Douglas Monty. The trial court found Robinson's trial counsel was ineffective for failing to properly investigate 'a most important aspect of this case—fire cause and origin expert opinions' and for failing to present sufficient expert testimony to refute claims made by the State's fire investigators. Robinson's attorney did not hire an arson expert to testify at trial, and he only consulted with an 'arson investigation-type expert, cause and origin person' less than two weeks before trial. After that person proved unhelpful, Robinson's attorney conducted no further investigation and then did not talk to another expert.

11

"In affirming the trial court's decision, this court noted the importance of thoroughly investigating both the facts and expert opinions to prepare a proper defense. As in *Robinson*, Buchhorn's counsel did not properly investigate the central issue in her case, which was Dr. Mitchell's theory on cause of death. And, also like *Robinson*, if Buchhorn's counsel had properly investigated Dr. Mitchell's expert opinions, they would have been able to undermine those opinions far more effectively. This court's description of *Robinson*'s counsel's failings is just as apt here. By failing to independently investigate Dr. Mitchell's theory and by failing to marshal expert evidence to directly challenge that theory, Buchhorn's counsel entered 'battle with the State unarmed and unequipped with the expertise [Buchhorn] needed for a defense.'

"As in *Robinson*, Buchhorn's counsel may have acted reasonably when they first hired Dr. Wigren to contest the timing of O.O.'s skull fracture. Still, just as the expert in *Robinson* was not qualified to refute the most important issue of the case, Dr. Wigren was not a neurological expert who could fully refute Dr. Mitchell's theory of instant death caused by the depolarization of nerves from blunt force trauma. And, like in *Robinson*, Buchhorn's counsel failed to make a comprehensive investigation of Dr. Mitchell's medical opinions, thus failing to equip Buchhorn with what she needed for a proper defense. It was not a reasonable strategy that led counsel to decline to investigate Dr. Mitchell's theory, but, rather, lack of thoroughness and preparation. [Citations omitted.]" *Buchhorn*, 2021 WL 3578032, at *10-11.

Like *Robinson* and *Buchhorn*, Cornwell failed to investigate central issues in the case—the basis for Dr. Frazier's diagnosis of J.F. as a sex abuse victim (Diagnosis Conclusion) and whether female child sex abuse victims show injuries to their hymens (Statistic Conclusion). But unlike *Robinson* and *Buchhorn*, Cornwell did not retain an expert at all—either to consult or testify. While defense counsel do not inherently provide ineffective assistance of counsel simply because they fail to retain an expert when the State has done so, counsel must still comprehensively investigate both the facts and expert opinions to prepare a proper defense. Cornwell did neither. His investigation amounted to reading Dr. Frazier's CV and calling another attorney to ask one question.

Cornwell's cursory investigation of Dr. Frazier is exacerbated by his failure to consult a medical practitioner to analyze her conclusions. Filbert raises this point on appeal. He urges us to rely on *Mullins v. State*, 30 Kan. App. 2d 711, 716-17, 46 P.3d 1222 (2002), which held that even though a decision to call or not call a witness is generally a matter of trial strategy, "when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of 'trial strategy' is inappropriate." In other words, because Cornwell failed to adequately investigate Dr. Frazier, he was not able to thoroughly assess whether retaining an expert to testify was appropriate.

Dr. Gilbert's report and testimony at the 60-1507 evidentiary hearing illuminates this conclusion and Filbert's contentions. If Cornwell had consulted an expert like Dr. Gilbert, he would have been provided with tools to bolster the defense's case and combat Dr. Frazier's Diagnosis and Statistic Conclusions. Dr. Gilbert explained at the evidentiary hearing that J.F.'s "normal" wellness exam contradicts Dr. Frazier's Diagnosis Conclusion. Apart from a notch in her hymen, J.F.'s vaginal exam was documented as "normal." Dr. Gilbert opined it was medically inaccurate for Dr. Frazier to "diagnose" J.F. as a victim of child sex abuse given the examination produced normal results. He believes there was no empirical or objective evidence to support the Diagnosis Conclusion. If Cornwell had consulted an expert like Dr. Gilbert, Dr. Frazier's damning diagnosis could have been challenged via a more thorough cross-examination or through a testifying defense expert.

In addition to arguing Cornwell conducted an insufficient investigation of Dr. Frazier, Filbert argues Cornwell should have conducted a *Daubert* hearing to challenge Dr. Frazier's expert Diagnosis and Statistic Conclusions and Cornwell neglected to consult a medical practitioner to evaluate Dr. Frazier's conclusions. K.S.A. 2024 Supp. 60-456, the statute concerning expert witnesses and the prerequisites for admissibility of expert opinions, reads:

13

"(a) If the witness is not testifying as an expert, the testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds: (1) Are rationally based on the perception of the witness; (2) are helpful to a clearer understanding of the testimony of the witness; and (3) are not based on scientific, technical or other specialized knowledge within the scope of subsection (b).

"(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

Under this statute, as under Federal Rule of Evidence 702, the court must decide first whether the expert is qualified "by knowledge, skill, experience, training or education" to render an opinion. K.S.A. 2024 Supp. 60-456(b). Second, the court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 [10th Cir. 2006]). Specifically, the court must determine whether the testimony "is based on sufficient facts or data," and is "the product of reliable principles and methods," and whether "the witness has reliably applied the principles and methods to the facts of the case." K.S.A. 2024 Supp. 60-456(b).

Under *Daubert*, the court determines the reliability of proposed scientific testimony by looking to factors such as (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance. 509 U.S. at 592-94. But these four factors are not a "'definitive checklist or test'" and a court's gatekeeping inquiry into reliability must be

14

"'tied to the facts'" of a particular "'case.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

Filbert particularly takes issue with Cornwell's treatment of Dr. Frazier's Statistic Conclusion. Cornwell did not object to Dr. Frazier's expert classification, testimony, or challenge her statistics during his brief cross-examination. Pertinently, the prosecutor and Dr. Frazier discussed what occurs (or lack thereof) to a young female's hymen when the female has sexual contact:

"Q. In this particular case you did not see any issue with [J.F.'s] hymen?

"A. Yes, other than the notch that I described.

"Q. Well, one would think if she was 12 and she had sex with a grown man as she alleged, there should be some injury, right?

"A. That's a common myth, yes.

"Q. Okay. You called it a myth, why do you call that a myth?

"A. So there—there's—there are various studies that look at the hymens of females who have had sexual contact. There's one published in pediatrics that even looked at females who are pregnant so clearly there was sexual contact. And most of the time, *90 to 95 percent of the time, even after multiple episodes of penetrative vaginal sexual contact, the hymen is normal.* . . . And again, the characteristics of it allow it to heal quickly so maybe there was injury at one point in time and you just can't see it. . . . So there are lots of characteristics of the hymen that makes it to where even if there's been repeated episodes of penetrative trauma or sexual contact, you can't tell just by looking at it.

"Q. So just because [J.F.]'s hymen was normal, that doesn't mean we can discount sexual contact?

"A. That's correct." (Emphasis added.)

When ultimately asked what her diagnosis of J.F. was, Dr. Frazier responded, "Child sexual abuse." Cornwell also testified that he did not confer with or retain any experts to investigate Dr. Frazier. And Cornwell noted he did not undertake any independent research or investigation into Dr. Frazier's statistics presented at trial. He

15

explained that he knew who Dr. Frazier was before this case and "even did her deposition either before or right after this in a Missouri sex case." Apparently, according to Cornwell, in every case he has been associated with and doctors from Children's Mercy are involved, the facility's doctors "always say it's child abuse or child sexual abuse because the victim said so."

He stated Dr. Frazier's testimony that J.F. had "an intact hymen [and] repeated rapes, seems to me that's pretty good for" the defense. He strategically wanted Dr. Frazier to testify that J.F. had an intact hymen. And he remarked that he did not challenge her testimony through *Daubert* because "she'd already been found to be an expert before."

While Cornwell may have thought Dr. Frazier was an expert (based on his past knowledge of her) in the sense that she possesses specialized knowledge under K.S.A. 2024 Supp. 60-456, that does not mean her Diagnosis and Statistic Conclusions were based on reliable principles and methods. As Filbert points out on appeal, it appears Cornwell believed *Daubert* was irrelevant since Dr. Frazier had been qualified as an expert before. But this conclusion fails to appreciate the intricacies and multiple requirements of K.S.A. 2024 Supp. 60-456 and *Daubert*. It appears that Dr. Frazier reached her Diagnosis Conclusion (J.F. is a sex abuse victim) because her Statistic Conclusion, allegedly based on "various studies," informed her that it is exceptionally common for female children like J.F. to have intact hymens even after multiple episodes of penetrative vaginal sexual contact. Put differently, the reliability of the principles and methods Dr. Frazier used to reach her conclusions were not challenged because Cornwell believed Dr. Frazier had specialized knowledge. Yet under K.S.A. 2024 Supp. 60-456 and *Daubert*, *both* requirements (in addition to others) must be met.

Although Cornwell consistently maintained Dr. Frazier's testimony was crucially necessary to show that J.F. had an intact hymen despite her claims about Filbert, that evidence still could have been admissible through Dr. Frazier as a fact witness. Filbert is

16

not challenging Dr. Frazier's observations during her examination of J.F.—he is challenging her expert opinion based on those observations, when she diagnosed J.F. as a sex abuse victim despite the intact hymen. Yet instead of the jury just factually hearing that J.F. had an intact hymen, it heard an expert conclusion that undercut the importance of this evidence—evidence which Cornwell claimed was key to his defense.

The district court characterized Cornwell's "strategy" for the handling of Dr. Frazier persuasive because it found he wanted her testimony admitted so he could highlight and have the jury question, "'[H]ow can a little girl with an intact hymen be repeatedly raped'"? But this finding is not supported by the record since Cornwell never mentioned J.F.'s intact hymen during closing. Instead, he only briefly mentioned Dr. Frazier's testimony and implied that it defied common sense. Just as hindsight *criticism* of an attorney's strategy must be tempered, so must hindsight *embellishment*. The court's findings on Cornwell's competency must be supported by substantial competent evidence, and this one is not.

Dr. Gilbert also explained at the 60-1507 evidentiary hearing why he believed the principles and methods Dr. Frazier relied on to reach her conclusions regrading J.F.'s "normal" examination were flawed. He stated that while he has heard before the "concept" that 95% of children show no signs of a physical injury despite claiming sexual abuse, he disagrees with that science. He clarified that he knows of that study, "where it came from and it's not great science either." Dr. Gilbert discussed one study that only evaluated females that were pregnant and "[t]wo or three of the children out of 36 had injury to the hymen. And if you were to do the math, that's 95 percent, roughly." Apparently, however, that study did not have control "time interval[s] between the alleged assault and day zero." Or more simply put, "[t]here was no true control group." This issue, according to Dr. Gilbert, is a "huge variable" that "skews all results."

17

Dr. Gilbert also noted that other studies have found that it is common for a hymen to look and appear normal a month removed from sexual contact as opposed to "examin[ing] them in a more acute setting, there is a much higher chance of seeing injury to the hymen." This same situation occurred in the present case where J.F.'s mother was apparently informed she should not bring J.F. in for an examination until a month passed although the more optimal time to have examined J.F. would have been as soon as possible.

While on the one hand the district court found Cornwell was effective for wanting to rely on the accuracy of Dr. Frazier's observation about J.F.'s hymen, it also concluded, without explanation, that Cornwell "crossed the doctor effectively, and argued disparaging inferences during closing arguments about the doctor's testimony." But Cornwell only briefly mentioned Dr. Frazier in closing, and both his cross-examination and closing largely focused on Dr. Frazier's anal examination of J.F. and very briefly discussed Dr. Frazier's preparation for the examination. Instead, Cornwell mainly focused on Filbert's impotence and the inconsistency of J.F.'s statements to her therapist about the incidents of sexual abuse. We find the district court's determination about Cornwell's effectiveness in this regard to be unsupported by the record as well.

This court remanded this case for an evidentiary hearing for fact-finding, among other things, on why Cornwell did not consult an expert to more closely examine the basis for Dr. Frazier's opinions and confirm their reliability as well as understand why Cornwell never sought a *Daubert* hearing. *Filbert*, 2023 WL 3563438, at *6-7. On remand, Cornwell explained that he wanted to admit Dr. Frazier's testimony so he could highlight for the jury evidentiary incongruities. But this allegation about his strategy was unsupported by the record and deeply flawed because Cornwell still could have permitted Dr. Frazier to testify about the facts of the case (J.F. presented at the hospital with an intact hymen but disclosed she had been raped on multiple occasions), without having Dr. Frazier testify about her incriminating opinions. Or, at the very least, Cornwell could

18

have consulted an expert on Dr. Frazier's Diagnosis and Statistic Conclusions to more thoroughly cross-examine her. For these reasons, we find Cornwell's performance was deficient under the totality of the circumstances.

B. *Cornwell's ineffective performance was prejudicial because it inhibited the defense from challenging the State's weakest evidentiary position.*

Filbert argues that Cornwell's deficient performance prejudiced his trial and there was a reasonable probability the outcome of his trial would have been different. See *Strickland*, 466 U.S. at 694. To support this argument, he claims Cornwell "acted as a matador, allowing Filbert's jurors to hear without meaningful pushback this medically unsupportable diagnosis buttressed by bogus statistics."

To prove prejudice did not occur, the State largely relies on other evidence presented at trial to show that Cornwell's deficient performance did not prejudice Filbert. For example, it cites Filbert's conversations with a coworker. At trial, the coworker testified that Filbert remarked about wanting to have an incestuous relationship with J.F. and that he had several friends in the Navy who were in similar relationships. He stated he wanted to "take care" of J.F. "sexually and as a brother at the same time and protect" her. Filbert also told his younger brother that he knew of people who "slept" with their sister. The younger brother also observed Filbert grab J.F. by the pants and look "down into [J.F.'s] pants." And Filbert asked a different brother if the brother could ask J.F. "if she would help him jerk off."

When assessing the second *Strickland* prong, a court must look at the totality of the circumstances. And it can evaluate whether "[t]here is considerable evidence sufficient to uphold the verdict." *State v. Rice*, 261 Kan. 567, 609, 932 P.2d 981 (1997). We agree with the State that this circumstantial evidence is significant and persuasive regarding Filbert's feelings, and a brother grabbing his little sister to look down her pants

19

is certainly improper. Yet Filbert's discussions about his desires to commit the relevant crimes charged do not establish that Filbert *acted* on these desires.

The major issue with Cornwell's deficient performance is that his failure to fully investigate and challenge Dr. Frazier's testimony resulted in his inability to oppose and expose one of the State's weakest points: J.F.'s medical examination presented normal results despite her disclosures about Filbert. While Cornwell maintained after the fact that he wanted Dr. Frazier's testimony in evidence to bring to light this point, his intentions did the exact opposite. By not questioning Dr. Frazier's methods or hiring an expert to analyze her conclusions, Cornwell welcomed the State to explain away this damning evidence with Dr. Frazier's Statistic Conclusion. The weakest fact for the State's case, with the possible exception of Filbert's impotence, was J.F.'s medical examination's normal results. The State was able to significantly diminish and almost entirely mitigate this unfavorable evidence (i.e., 95% of individuals like J.F. present normal examinations despite their claims) with Dr. Frazier's testimony.

Cornwell's inability to weaken this key evidence undermines our confidence in Filbert's conviction and marks the jury trial as fundamentally unfair. See *Strickland*, 466 U.S. at 694.

II. *Did the district court err in finding Cornwell's approach to Erin Miller-Weiss was not ineffective assistance of counsel?*

Filbert also alleged in his 60-1507 motion and arguments on appeal that Cornwell was ineffective with respect to Erin Miller-Weiss. First, Filbert contends Cornwell was ineffective because he should have conferred with an expert to assess Miller-Weiss' forensic interview of J.F. He secondly argues, in the same vein, that Cornwell's performance was prejudicially ineffective because Filbert's postconviction expert

determined Miller-Weiss asked J.F. 89 improper leading questions which led to J.F.'s disclosures being "coached as a result."

A. *Cornwell provided Filbert ineffective assistance of counsel when he failed to properly challenge Miller-Weiss' testimony.*

Before trial, the State designated Miller-Weiss as an expert. She told jurors at the trial that she had experience as an expert in forensic interviewing. But "[g]iven the district court's ambiguous pretrial comments, it was unclear whether Miller-Weiss was testifying as an expert or a lay witness." *Filbert*, 2023 WL 3563438, at *2.

We remanded this case for an evidentiary hearing on this issue to understand why "Cornwell did not object to Miller-Weiss' testimony, and his brief cross-examination did not address her qualifications or interview methods." *Filbert*, 2023 WL 3563438, at *2. Because "[i]f a defendant is convicted of child sex crimes based 'primarily on the testimony of the victim,' then failing to challenge the reliability of earlier disclosures in a forensic interview can impair the ability to challenge the victim's trial testimony." *Filbert*, 2023 WL 3563438, at *8. We relied on *Mullins*, 30 Kan. App. 2d at 717, to conclude "[f]ailing to consult an expert about those earlier disclosures or the interview techniques employed may constitute ineffective assistance of counsel in some cases." *Filbert*, 2023 WL 3563438, at *8.

At the evidentiary hearing on Filbert's 60-1507 motion, Cornwell testified he did not contact any experts about Miller-Weiss' testimony. He said he did not investigate Miller-Weiss' background and the extent of his research on her was "probably" showing her interview with J.F. "to somebody in my office." He also noted he did not engage in any pretrial challenge to the forensic interview, like a *Daubert* motion. Cornwell explained that he did not challenge Miller-Weiss' interview because he "had seen her before," and "I thought she did what she was supposed to do. She didn't lead. She didn't

21

suggest. That was my opinion." He said he strategically wanted J.F.'s statements in the forensic interview to come in so he could point out inconsistencies in her disclosures. Apparently, Cornwell's file on Miller-Weiss' interview, which was "tab[bed]" with all of J.F.'s inconsistences, was in a "file at [his] office." But Cornwell did not identify any specific inconsistencies at the evidentiary hearing.

The district court found Cornwell made a strategic decision to allow J.F.'s disclosures to be admitted into evidence so he could point out inconsistences in her testimony. And it determined Cornwell made the strategic decision to not lodge a *Daubert* challenge to Miller-Weiss' testimony so the jury could hear the forensic interview. But the district court's decision failed to address Filbert's and this court's chief concerns that Filbert was primarily convicted based on Miller-Weiss' forensic interview of J.F. and how, under *Mullins*, a trial counsel's failure to challenge the reliability of earlier disclosures in a forensic interview can impair the ability to challenge the victim's trial testimony. *Filbert*, 2023 WL 3563438, at *8.

In *Mullins* this court found that defense counsel was ineffective for failing to consult an expert on interviewing techniques when the conviction was based solely on the child victim's testimony, and had counsel called an expert, the jury would have heard strong evidence to potentially undermine the allegations of abuse. 30 Kan. App. 2d at 712. Mullins was given an evidentiary hearing on his K.S.A. 60-1507 motion at which he presented uncontroverted testimony from an expert that there were issues with the child victim's interview and from a defense attorney that it was common knowledge among defense attorneys that there is no valid strategy for failing to use an expert in that type of case. 30 Kan. App. 2d at 712-13. Mullins' attorney also testified that he had no experience in sexual abuse cases and did not look into the possibility of hiring an expert even though he had concerns about the interview. 30 Kan. App. 2d at 714-15.

22

Also, in *Mullins*, we noted the decision of whether to call certain witnesses is a matter of trial strategy, but we found that defense counsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained facts on which that decision could be made. 30 Kan. App. 2d at 716-17. Ultimately this court found that Mullins' counsel's performance was objectively unreasonable, highlighting these facts: (1) Mullins was convicted primarily based on the testimony of the victim, (2) the victim's physical exam showed no signs of abuse, and (3) there was no expert to rebut the testimony of the nurse and victim. 30 Kan. App. 2d at 712.

In *Chubb v. State*, No. 99,912, 2009 WL 929136, at *7 (Kan. App. 2009) (unpublished opinion), this court determined the defendant was entitled to an evidentiary hearing when he argued that his attorney failed to obtain an expert on child interviews. Chubb was convicted based on the testimony of three children who said he sexually abused them and his statement that he could not remember because he was using cocaine heavily during that time. Chubb relied on *Mullins* and *State v. Huntley*, 39 Kan. App. 2d 180, Syl. ¶ 5, 177 P.3d 1001 (2008), in which we held that testimony from an expert on child-witness interviewing techniques could be critical to the defense when the defense was heavily reliant on casting doubt upon the reliability of child witnesses. We found Chubb may have a good argument based on *Mullins* and *Huntley* and that he should have an opportunity to develop and support his argument with evidence. *Chubb*, 2009 WL 929136, at *3; see also *State v. Howling*, No. 116,524, 2017 WL 4561832, at *4 (Kan. App. 2017) (unpublished opinion) ("Based on a review of Kansas caselaw, a party typically challenges forensic interview evidence by having a qualified expert testify regarding the particular techniques used by the interviewer—and the techniques' reliability.").

Filbert's case is like *Mullins*, *Chubb*, and *Huntley* because: (1) Filbert was convicted primarily based on the testimony of J.F., (2) J.F.'s physical exam showed no

23

signs of abuse other than a notch in her hymen which was determined to be inconclusive, and (3) there was no expert to rebut the testimony of Miller-Weiss and J.F.

The State, however, pushes back on Filbert's *Mullins* reliance because it believes the *Mullins* court's primary concern was defense counsel's inexperience with sexual abuse cases. And it is true we made it clear in *Mullins* that our holding was limited to the facts of that case, and we have generally declined to extend the holding. See *Hall v. State*, No. 109,168, 2014 WL 1096748, at *7 (Kan. App. 2014) (unpublished opinion) (declining to extend *Mullins* under facts presented); *Westerman v. State*, No. 94,627, 2006 WL 2440003, at *3 (Kan. App. 2006) (unpublished opinion); *Snavely v. State*, No. 89,156, 2003 WL 22430275, at *2 (Kan. App. 2003) (unpublished opinion). In these cases, we generally found there was sufficient evidence other than the victim's testimony or that trial counsel was experienced in sexual abuse cases and sufficiently considered whether to consult an expert.

That said, we find the State's attempt to distinguish *Mullins* is unconvincing. Filbert was primarily convicted based on Miller-Weiss' forensic interview with J.F. and Dr. Frazier's Diagnosis Conclusion which was also founded in J.F.'s disclosures. While the State is correct that other circumstantial evidence supports Filbert's conviction, like his comments to his coworker and brothers, as discussed above, those comments tend to prove Filbert had an intent to commit these crimes. His statements were not direct admissions of guilt showing he *acted* on his intentions. And while it is accurate for the State to conclude Cornwell was more experienced than the attorney in *Mullins*, since he had tried between 200 and 300 felony jury trials including several child sex abuse cases, Cornwell did not even consider consulting an expert. Simply because an attorney is experienced does not mean their performance is automatically effective.

Although Cornwell claimed at the evidentiary hearing that he strategically wanted Miller-Weiss' testimony to be admitted so he could highlight inconsistencies in J.F.'s

24

disclosures, a review of the record shows this reasoning was hardly acted on. Cornwell's cross-examination of Miller-Weiss was brief, and he only asked Miller-Weiss around a dozen questions. And he asked her about just one inconsistency in J.F.'s disclosure:

"Q. Children make mistakes trying to recollect things, correct?

"A. Yes.

"Q. Sometimes she said she couldn't remember what she did the day before, correct?

"A. Yes.

"Q. We all have those issues, don't we?

"A. Yes.

"Q. I noted that in the video at 10:23:19 she said that she had anal sex twice in the barn and that at 10:34 it happened in the barn anally once. So in those 11 minutes she was having memory issues, correct?

"A. She was reporting two different things, yes.

"Q. Right. One time she said anal once in the barn and then anal twice in the barn?

"A. Correct.

"Q. And that's just a mistake that she made?

"A. I can't explain it."

And in closing arguments, Cornwell again relied on this one inconsistency to question J.F.'s disclosure:

"Is it corroboration when this little girl—and you can look at the video, it's at 10:23—says that it was anal intercourse twice in the barn and then at 10:34 she says it was just once in the barn? Well, she's a little girl, maybe she's confused. But just watch, just look, just think about what she says. She says it happened in the barn maybe once or twice. She says it happened in the living room, in the bedroom, in the bathroom, any number of places, but she told her therapist—remember her therapist got up here—and I asked her how many things—how many incidents have you been talking to her about? Two, the one in '12 and the one she said happened most recently, not these other places. Now, that's not me calling that witness, that's not me prepping that witness, that's not me trying to trick anybody. She comes in and she says two times in 2012 being the first one."

25

Cornwell also inquired about a potential inconsistency between J.F.'s disclosure and Filbert's phone (although, importantly, this is not an internal inconsistency in J.F.'s disclosures and it relies on external evidence, i.e., Filbert's phone):

> "Q. And she indicated that there was some porn that she looked at?
> "A. She reported that she came across the pornography, she believed it was called pornography, on Jeremy's phone when he let her use it.
> "Q. Did she indicate to you that in here that there was some nude pictures of her, partially clothed pictures of her on the phone?
> "A. Yes."

And in closing arguments, Cornwell stated:

> "This phone would corroborate abuse. You heard her say on the witness stand, on that video at Sunflower House, that he took pictures of her in the shower, coming out of the shower. You'll see the pictures where it is, take a close look at where that shower is, and she said she saw it on there. So when he's arrested, there's nothing on [the phone].
>
>     . . . .
>
> "Where is it? It's not here. That doesn't corroborate anything."

While Cornwell's cross-examination of Miller-Weiss and his closing arguments demonstrate he pointed out an inconsistency in J.F.'s disclosure as well as a *possible* inconsistency with Filbert's phone, and relied on those inconsistencies, the question becomes whether that was a reasonable trial strategy given Filbert's conviction was largely based on Miller-Weiss' testimony and J.F.'s disclosures. Critically, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689. Given this sentiment, the more appropriate question is whether Cornwell's strategic decision to point out one or two inconsistencies in J.F.'s disclosures was unreasonable because he failed to investigate Miller-Weiss and more holistically challenge her testimony. See *Buchhorn*, 2021 WL 3578032, at *10-11.

And as discussed, Cornwell admitted he did not investigate Miller-Weiss' background or consult an expert witness on J.F.'s disclosures. Cornwell's strategic decision, consequently, was based on no investigation of Miller-Weiss and her forensic interview of J.F. That strategic decision led Cornwell to be unprepared to challenge the State's most incriminating evidence: J.F.'s disclosure. And it led him to only challenge periphery points in Miller-Weiss' cross-examination that were whispers in the large storm of J.F.'s disclosure. See *Ulate v. State*, No. 108,654, 2013 WL 5422361, at *7 (Kan. App. 2013) (unpublished opinion) (noting that even though defense counsel did not retain an expert to testify on the defendant's behalf, counsel still thoroughly cross-examined the State's witnesses). Cornwell's strategy to highlight an inconsistency in the number of times J.F. was sodomized pales in comparison to the weight of J.F.'s forensic interview.

This conclusion is illuminated by Filbert's second point that Dr. Barnett's testimony demonstrates Cornwell's performance prejudiced him.

B. *Cornwell's performance was ineffectively prejudicial because he failed to appropriately investigate and challenge Miller-Weiss' approach to her interview with J.F. and Filbert was largely convicted based on J.F.'s disclosures to Miller-Weiss.*

Filbert argues that Dr. Barnett's testimony about Miller-Weiss' interview techniques proves that Cornwell's deficient performance was prejudicially ineffective. In particular, Filbert repeatedly highlights the fact that Dr. Barnett found Miller-Weiss asked J.F. "89 improper 'leading and suggestive' questions, which imply the answers that the interviewer wants or expects the child to confirm." Dr. Barnett opined that this approach "essentially coaches the child what to say."

During the evidentiary hearing, Dr. Barnett provided an example of a leading question Miller-Weiss asked J.F.:

27

"A. Okay. On video two, number 4, it says, 'And did Jeremy put his penis anywhere else other than your vagina, your anal, or your mouth?'

"Well, the presumption is that he did put his penis in her vagina, her anus, and her mouth. She is just confirming that to the child and saying, okay, any place else other than these, which apparently he—they're asserting that he did or alleging that he did."

Dr. Barnett also testified that the forensic interviewing protocol referenced in Miller-Weiss' CV and employed by the interviewers at her place of employment, Sunflower House, is not empirical. It has never been tested, and it has no known error rate.

Filbert believes that Dr. Barnett's testimony shows that if Cornwell had consulted an expert (like Dr. Barnett), then Miller-Weiss' inculpatory testimony and/or interview with J.F. would have been significantly limited. That limitation could have occurred through a pretrial *Daubert* motion. But see *State v. Ballou*, 310 Kan. 591, 611, 448 P.3d 479 (2019) ("[N]o specific formula or protocol need be followed when conducting [a forensic] interview."). Or, Cornwell could have gained the tools to conduct a more thorough cross-examination of Miller-Weiss that was not confined to whether J.F. was sodomized in the barn once or twice. Cornwell could have developed an extensive cross-examination based on Dr. Barnett's conclusions that Miller-Weiss asked dozens of questions leading J.F. to "coached" answers. Even if Miller-Weiss' testimony could not be limited through *Daubert* (under *Ballou*), an expert like Dr. Barnett could have testified about the limits and potential problems with Miller-Weiss' approach.

The State complains that Dr. Barnett would not have been permitted to testify that J.F. was coached because that would be commenting on the credibility of J.F. See *State v. Manning*, 270 Kan. 674, 698, 19 P.3d 84 (2001) ("Questions which compel a defendant or witness to comment on the credibility of another witness are improper."). But the State fails to explain how this is a credibility issue. Just like a forensic interviewer is permitted to testify regarding the procedures of such interviews, experts reviewing the interviews can critique the procedure employed by the forensic interviewer. *State v. Gaona*, 293

28

Kan. 930, 946, 270 P.3d 1165 (2012) (quoting *State v. Criqui*, No. 88,388, 2003 WL 22119226, at *4 [Kan. App. 2003] [unpublished opinion]) (An expert witness can testify on "'(1) the proper and improper interviewing procedures and techniques to be used in child sexual abuse cases; (2) how certain procedures and techniques could adversely affect the reliability and accuracy of a child's statements; and (3) the problems that [the expert] perceived with the interviewing techniques used in [defendant's] case.'").

In opposition to Filbert's second issue, the State mainly relies on the similarities of Filbert's case to *Ballou*. There, Ballou presented the testimony of Dr. Barnett, who criticized a forensic interview protocol and the application of that protocol. The Supreme Court held: "[E]xpert testimony is not necessarily required as a foundation to introducing a child witness' interview into evidence and no specific formula or protocol need be followed when conducting an interview." 310 Kan. at 611. Consequently, "the failure to present expert testimony or for an interviewer to follow a specific protocol does not render the interview inadmissible." 310 Kan. at 611. While Filbert repeatedly mentions *Daubert* in context of this issue, he never expressly states Cornwell was ineffective for failing to lodge this motion. Perhaps this is because of *Ballou*'s cautionary ruling.

The State, however, is still wrong that *Ballou* resolves Filbert's argument regarding forensic interviewing. It fails to appreciate that Filbert's main concern with Cornwell's approach to Miller-Weiss' interview was not that he failed to lodge a *Daubert* motion. Rather, Filbert argues Cornwell was ineffective for failing to investigate Miller-Weiss and present an expert who could challenge Miller-Weiss' procedures and methods. Cornwell would still have been able to present an expert witness to opine on Miller-Weiss' interview under *Ballou* and *Gaona* because "'[j]urors do not possess this information,'" and a defense expert's testimony on the forensic interviewer is "'helpful to their understanding of the case.'" *Ballou*, 310 Kan. at 609 (quoting *Gaona*, 293 Kan. at 948).

Under the circumstances, we find Cornwell's failure to challenge Miller-Weiss' approach to her interview with J.F. was prejudicial because like *Mullins*, Filbert was largely convicted based on J.F.'s disclosures to Miller-Weiss and Cornwell failed to investigate and challenge her interview procedures. Had Cornwell conducted *any* investigation into Miller-Weiss' forensic interview, potentially by consulting an expert like Dr. Barnett, he would have been able to, at the very least, challenge Miller-Weiss' procedures and methods through a thorough cross-examination or testimony of a defense expert. As a result, we find there is a reasonable probability of a different outcome in this case had Cornwell effectively investigated and therefore challenged Miller-Weiss' forensic interview in an appropriately informed way. Since Cornwell conducted no investigation into Miller-Weiss' background and the extent of his review of her interview was simply showing it to a colleague, J.F.'s incriminating disclosures were admitted largely unchallenged.

III. *Did the district court err in finding Cornwell's failure to introduce documentary evidence of Filbert's impotence was not ineffective assistance of counsel?*

Last, Filbert alleged in his 60-1507 motion and his arguments on appeal that Cornwell was ineffective because he failed to introduce documentary evidence that showed Filbert was diagnosed with impotency.

A. *Cornwell was ineffective for failing to introduce objective medical records that diagnosed Filbert with ED.*

Filbert's VA medical records showed he was diagnosed with ED. The records demonstrate he had been treated for ED since 2013 and was diagnosed with hypogonadism in May 2014. Although it appears Filbert believed the ED was from a back condition due to his military service, the records noted: "There is no causal

30

relationship between lumbar disc disease/microdiscectomy with radiculopathy and endocrine disorders." Cornwell did not try to admit these files.

This court remanded this case for an evidentiary hearing on whether Cornwell acted reasonably in handling these documents. It heeded that "official documentation would have corroborated" testimony from Filbert and his ex-girlfriend who both stated Filbert was impotent. *Filbert*, 2023 WL 3563438, at *9. If Cornwell had admitted these documents, we noted Cornwell would have "avoided the credibility concerns that can come with live witnesses—especially when one of those witnesses is the defendant." 2023 WL 3563438, at *9.

On remand, Cornwell explained that his reasoning behind not using the medical records was that the records showed the Navy denied Filbert VA benefits because the Navy concluded Filbert's erectile dysfunction was not caused by his injuries sustained while serving. And Cornwell's theory was that Filbert was "injured in the Navy, and now [he has] erectile dysfunction." Cornwell believed the medical records would have "hurt" the theory he was presenting to the jury. He even agreed it was the defense's hypothesis that the ED was from his military injury even though "that hypothesis was not borne out by the medical records." Cornwell failed to explain why he would create and employ a defense theory that was fictious and not based on medical facts.

In reaching its conclusion to deny Filbert's 60-1507 motion, the district court deferred to Cornwell's claimed strategy. Since the medical records dismantled the defense's theory, the court believed it was a reasonable trial strategy for Cornwell to ignore the evidence and pursue this concocted, inaccurate path.

Cornwell's explanation for not offering Filbert's medical records is unreasonable in more than one way. Not only is his decision questionably unethical since he constructed and deployed a defense strategy he knew was disproved by medical records, but pushing

the theory that Filbert's ED was from a military back injury was unnecessary. The cause of Filbert's ED was not relevant—just the fact that he had it at the time of J.F.'s allegations.

B. *Cornwell's failure to introduce objective evidence undermined Filbert's defense.*

Cornwell's defense at trial was that sexual intercourse between Filbert and J.F. was a physical impossibility. Both Filbert and his ex-girlfriend testified that Filbert was impotent. And in closing arguments, Cornwell relied on the impotence to urge the jury to acquit Filbert:

> "Does he have erectile dysfunction? I don't know. His ex-girlfriend came in here. She's an adult, she was an adult throughout their entire relationship. All she can tell you is that he wasn't—he wasn't able to achieve that erection with her. Doesn't mean anything with regards to [J.F.]."

This defense would have been unquestionably bolstered by objective medical records that state Filbert was medically diagnosed with ED.

The State has two issues with Filbert's argument. First, it points to Filbert's and his ex-girlfriend's testimonies to show that evidence of his ED was presented at trial. In other words, the State is implying that because Cornwell presented witness testimony on ED, it was not ineffective for him to avoid admitting the medical records. But the State fails to appreciate the variables of witness testimony. See *Filbert*, 2023 WL 3563438, at \*9 ("[O]fficial documentation would have corroborated this testimony and avoided the credibility concerns that can come with live witnesses—especially when one of those witnesses is the defendant."). Unlike physical evidence (e.g., Filbert's medical records), witness credibility can be assessed by a witness' "'demeanor, body language, voice

32

inflection,' and other observations pertinent to a witness' credibility." *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 505, 509 P.3d 1211 (2022).

In *Wilson v. State*, 51 Kan. App. 2d 1, 5, 340 P.3d 1213 (2014), this court reviewed a 60-1507 claim where Wilson argued his trial counsel was ineffective for failing to introduce material evidence, including police reports and witnesses to impeach the State witnesses' testimonies. This court affirmed the district court's decision to order a new trial because physical evidence would have "seriously undermined" an eyewitness' credibility. 51 Kan. App. 2d at 26. Similarly, Filbert's medical records would have provided official documentation that could undermine J.F.'s credibility that Filbert was able to rape her. See *McHenry v. State*, 39 Kan. App. 2d 117, 123, 177 P.3d 981 (2008) (finding that an attorney's failure to investigate key issues surrounding the State's witnesses fell below minimum standards in a case that turned on credibility). Witness credibility was key in Filbert's case. Besides Filbert's conversations with his coworker and brothers, the case largely rested on whether J.F.'s disclosures were more credible than Filbert's claim that he did not rape her.

The State's second issue with Filbert's argument is inexplicable. It argues that Filbert's medical records show he was diagnosed with ED *before* the alleged crimes occurred. It believes this could have "seriously undermined his defense at trial." But the State fails to explain its reasoning here. Indeed, it would be beneficial for the defense to show that Filbert was medically and objectively diagnosed with ED before the alleged incidents because it would support the theory that Filbert could not engage in sexual intercourse and was therefore unable to rape her. The medical records would seemingly hold less weight if Filbert was diagnosed with ED *after* J.F. made her disclosures.

But since the medical records state that Filbert "has also had a great deal of difficulty lately with erectile dysfunction and not having any sensation during sex, and difficulty getting and maintaining an erection at other periods of time. This is somewhat

33

episodic," the State believes the medical records would undermine the defense's strategy because it "shows he has been having sex and that his dysfunction is not all the time but periodically." This argument is unavailing, however. The medical records objectively confirm that Filbert had ED and would have provided material support for witness testimony. If the medical records had been entered and the State wished to make an argument that there were times Filbert could have sex since his ED was "episodic" it could do so. But that does not take away from the fact that medical doctors diagnosed Filbert with a problem that would support his defense and claim that he did not rape J.F. The evidence objectively bolsters Filbert's chief defense that he could not have raped J.F. because he was impotent.

There is a reasonable probability of a different outcome in Filbert's trial had Cornwell introduced the medical records that objectively diagnosed Filbert with ED before the alleged rapes. The medical records "undermine [the] confidence" in Filbert's conviction and mark the criminal proceeding as fundamentally unfair. See *Strickland*, 466 U.S. at 694.

CONCLUSION

As this court has oft-repeated, it is not an easy decision to grant a new trial to someone who has been convicted of serious crimes like the ones here. But more important than the severity of the crime is the fundamental principle of American law—all accused must receive a fair trial. Given the serious flaws in Cornwell's strategy and the lack of evidence supporting the court's factual findings about that strategy, our confidence in the fairness of Filbert's trial has been so undermined that we see no other choice but to reverse the district court's decision and to remand for a new trial.

Reversed and remanded with directions to grant the K.S.A. 60-1507 motion, set aside Filbert's conviction, and grant a new trial.